IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **YOUTH ADVOCATE PROGRAMS, INC.,** : | Civil Action No. 1:06-CV-847 |
| Plaintiff : | |
| : | (Judge Conner) |
| v. : | |
| : | |
| **KANSAS CITY LIFE INSURANCE COMPANY,** : | |
| Defendant : | |

## MEMORANDUM

Before the court is defendant's motion to stay the instant proceedings and compel arbitration of plaintiff's claims in the manner specified by an agreement that existed between the parties during the relevant time period.  For the reasons that follow, the motion will be granted.

**I.    BACKGROUND**[1]

*The administrative services only agreement*

Plaintiff Youth Advocate Programs, Inc. ("Youth Advocate") is a Pennsylvania non-profit organization that serves youths and families through non-residential community-based programs.  From 1996 forward, Youth Advocate has maintained an employee benefit program (the "Plan") that uses traditional insurance and self-insurance mechanisms to provide medical, dental, vision, and disability benefits to its more than 2,000 employees.

---

[1] Except where otherwise indicated, the following information is derived from the allegations in plaintiff's amended complaint.  (Doc. 24.)

Youth Advocate has no specialized, in-house expertise in the area of plan administration, so it contracts with an administrative services provider that is responsible for the management of the Plan. In May 2002, and then again in May 2003, Youth Advocate entered into a twelve-month administrative services only agreement (the "ASO") with defendant Kansas City Life Insurance Company ("KCL"), whereby KCL was to act as Youth Advocate's administrative services provider in association with the Plan. Among other things, the ASO set forth responsibilities of the parties and contained a clause requiring "any dispute, controversy or question arising under" the ASO to be resolved through binding arbitration.

***The Trustmark stop-loss insurance policy***

In order to insure against catastrophic financial losses from unexpected high claims payments under the Plan, Youth Advocate purchased a "stop-loss" insurance policy to cover losses exceeding certain pre-determined limits on a per claim or aggregate basis. During the relevant time period, Youth Advocate's stop-loss insurance was underwritten by Trustmark Insurance Company ("Trustmark"). As part of the underwriting process, Trustmark required Youth Advocate to identify claimants who could potentially exceed the stop-loss policy deductible or who suffered from ongoing conditions material to the underwriting of the stop-loss policy. Trustmark set forth various disclosure parameters and required the relevant information 30 days before the proposed effective date of the stop-loss policy. Additionally, Trustmark required that the disclosures be updated through

the effective date of the stop-loss policy.

On or about May 28, 2003, Youth Advocate received from KCL an application for the stop-loss insurance coverage to be underwritten by Trustmark. Youth Advocate completed the application and returned it to KCL, which forwarded the application to Trustmark. KCL then compiled the information to be disclosed to Trustmark. On June 13, 2003, Susan Treadwell of KCL provided Youth Advocate with a form identified as a "Disclosure Statement" that was to be signed by Youth Advocate and returned to Trustmark as part of the underwriting process. Several reports were attached to the disclosure statement, including "Member Maintenance" and "Member Benefit History" forms and a "Disability History Report" covering the period from May 1, 2003, through June 15, 2003.

Relying on Treadwell's representations that the documentation was complete and responsive to Trustmark's requests, Minette Bauer of Youth Advocate signed the disclosure statement on June 23, 2003, and mailed it to KCL on or about June 25, 2003. After receiving the signed disclosure statement, KCL forwarded the same to Trustmark without updating any information. In October 2003, following this application and disclosure process, Youth Advocate and Trustmark entered into a stop-loss insurance contract effective May 1, 2003, through April 30, 2004 (the "Stop-Loss Policy").

In 2003, two individuals employed by Youth Advocate, Clinton Fischer and Winifred Brinson, incurred hundreds of thousands of dollars of medical expenses covered under the Plan and for which Youth Advocate sought coverage under the

Stop-Loss Policy. Trustmark insisted on conducting a "disclosure review" regarding these patients and their claims, and concluded that the failure to include certain information about Fischer and Brinson in the disclosure statement and associated reports excluded them, in whole or in part, from coverage under the Stop-Loss Policy.

Youth Advocate alleges that it has suffered damages in an amount not less than $639,019.27 as a result of the inadequate disclosures prepared by KCL and the resulting exclusion of certain claims from coverage under the Stop-Loss Policy.

***2004 litigation*** [2]

As a result of the denial of the Fischer and Brinson claims, Youth Advocate commenced a diversity action in 2004 in the Middle District of Pennsylvania against both KCL and Trustmark. See Youth Advocate Programs, Inc. v. Kansas City Life Ins. Co., No. 1:04-CV-02459 (filed Nov. 11, 2004). Youth Advocate alleged that Trustmark breached its obligations under the Stop-Loss Policy and violated Pennsylvania's Bad Faith Statute, 42 Pa. Cons. Stat. § 8371, *et seq.*, and as a result, Youth Advocate sought damages and a declaratory judgment that Fischer and Brinson were covered by the Stop-Loss Policy.[3] (Doc. 1.)

Youth Advocate also asserted a breach of contract claim against KCL arising

---

[2] The docket numbers in this subsection relate to the 2004 lawsuit, filed at 1:04-CV-02459.

[3] Youth Advocate voluntarily dismissed Trustmark from the 2004 litigation on January 2, 2005. (Doc. 13.)

from its failure to disclose the relevant medical information about Fischer and Brinson to Trustmark. Youth Advocate alleged that the compilation of this information, completion of the disclosure forms, and generation of the appropriate and up-to-date reports were obligations KCL assumed under the ASO, and that the ASO imposed an obligation on KCL to indemnify Youth Advocate for KCL's negligence and breach of its duties.

In its answer, KCL asserted that it was not contractually obligated to compile disclosure information required by Trustmark. (See Doc. 8 ¶¶ 13, 105, 106.) Shortly thereafter, KCL moved to dismiss the count advanced against it or, in the alternative, to refer the case to arbitration in accordance with the ASO. (Doc. 6.) In February 2005, the court granted KCL's motion insofar as it stayed the proceedings pending arbitration of the breach of contract claim against KCL. (Doc. 16.)

Nearly a year after the matter was referred to arbitration, the court ordered Youth Advocate and KCL to file a joint status report. (Doc. 18.) Upon being notified by the parties in February 2006 that its involvement was no longer required in light of the pending arbitration (Doc. 19), the court dismissed the case without prejudice (Doc. 20).

***The instant litigation***

On April 24, 2006, Youth Advocate commenced the instant lawsuit against KCL, alleging that KCL's failure to make the appropriate disclosures caused Youth Advocate to incur damages in amount not less than $639,016.27. On November 14, 2006, Youth Advocate filed an amended complaint. (Doc. 24.) Unlike the 2004

5

litigation—wherein Youth Advocate alleged breach of the ASO—in the present lawsuit, Youth Advocate alleges that a separate agreement existed between it and KCL and advances four alternative theories of liability: breach of this separate express contract (Count I); breach of an implied contract (Count II); detrimental reliance (Count III); and negligence (Count IV). (Doc. 24.) According to Youth Advocate's present complaint, a separate agreement was created through, or evidenced by, certain email correspondence between the parties. Allegedly, KCL's obligation to compile and update the disclosure information arose under this express or implied contract, not the ASO. (Doc. 24 ¶¶ 11, 88-107.) Alternatively, Youth Advocate contends that it reasonably, foreseeably, and detrimentally relied on KCL's promises to compile the appropriate information and that KCL was negligent in discharging a duty that it voluntarily undertook as a business accommodation to Youth Advocate. (Id. ¶¶ 12, 109-112, 115-118.)

KCL has moved to stay or dismiss the instant proceedings and compel arbitration of Youth Advocate's claims pursuant to the arbitration provision contained in the ASO. (Docs. 13 and 27.) The matter has been fully briefed and is ripe for disposition.[4]

---

[4] KCL had moved to stay or dismiss the proceedings and compel arbitration prior to the filing of Youth Advocate's amended complaint. (Doc. 13.) In the order granting Youth Advocate leave to file an amended complaint, the court directed the parties to supplement the motion to compel arbitration to the extent that the amended complaint might modify the court's analysis. (Doc. 28.) KCL thereafter filed a renewed motion to stay or dismiss the proceedings and compel arbitration. (Doc. 27.) Upon joint request from the parties, the court extended the supplemental briefing deadlines. (Doc. 28.) While the court will deny the motion filed before the

## II. STANDARD

When adjudicating a motion to compel arbitration, the court must analyze two basic issues: (1) whether the parties have entered into a written agreement to arbitrate and (2) whether the dispute in question falls within the scope of that agreement.  Nationwide Mut. Ins. Co. v. Cosenza, 258 F. 3d 197, 202 (3d Cir. 2001); see U.S. Small Business Admin. v. Chimicles, 447 F.3d 207, 209 (3d Cir. 2006) (requiring a written agreement before a court can compel arbitration); see also 9 U.S.C. § 2 (addressing the validity, irrevocability, and enforcement of written agreements to arbitrate).  Absent language in the parties' agreement clearly providing otherwise, the arbitrability of a dispute is a question of law for the court to determine.  Chimicles, 447 F.3d at 209; General Electric Co. v. Deutz AG, 270 F.3d 144, 154 (3d Cir. 2001).

In construing the scope of an arbitration provision, the court operates under a presumption of arbitrability.  AT&T, Inc. v. Communications Workers of Amer., 475 U.S. 643, 650 (1986).  This presumption is particularly strong when the parties contractually agree to an arbitration provision broadly encompassing all disputes arising from or out of the agreement.  Id.; see Battaglia v. McKendry, 233 F.3d 720, 725 (3d Cir. 2000) ("This presumption of arbitrability is particularly applicable where the arbitration clause at issue is broad.").  Absent positive assurance that the

---

amended complaint as moot (Doc. 13), the court will consider the arguments advanced in support of and against both motions to compel arbitration (Docs. 13 and 27) insofar as the latter briefs were simply intended to supplement those filed in relation to the first motion to compel arbitration.

arbitration clause is not susceptible of an interpretation that covers the asserted dispute, arbitration should be compelled.  AT&T, 475 U.S. at 650.

### III. DISCUSSION

Both parties agree that they are subject to a binding written agreement containing a valid arbitration clause.  The parties disagree, however, whether the instant dispute falls within the scope of the ASO and its arbitration provision.[5]

KCL argues that the instant complaint is a thinly veiled diversion by Youth Advocate to avoid the obvious applicability of the arbitration provision, a provision it believes to encompass this matter as a "dispute, controversy or question arising under [the ASO]."  (Doc. 14 at 2, 6.)  KCL maintains that the complaint is "based on the same underlying factual allegations, allege[s] the same harm and seek[s] the same damages" as the 2004 complaint, and it urges the court to see through Youth Advocate's "transparent attempt to . . . superficially repackag[e]" its 2004 contract litigation under these new theories of liability.  (Id. at 3, 6.)  Although it concedes that the present dispute, like the 2004 complaint, is based upon KCL's purported

---

[5] The ASO agreement contains the following arbitration provision:

> It is understood and agreed that any dispute, controversy or question arising under the terms of this Agreement shall be referred for decision by arbitration by an arbitrator selected by the parties. . . . Arbitration shall be the exclusive remedy for dispute arising under this Agreement.  The decision of the arbitrator shall be final, conclusive, and binding, and no action at law or in equity may be instituted by either party other than to enforce the award of the arbitrator(s).

(Doc. 14-3 at 10, 36, ASO agreement, § L.)

failure to compile, update, and provide the required disclosure information to Trustmark, Youth Advocate asserts that the source of KCL's duty as pleaded in the 2006 complaint is no longer the ASO; rather, Youth Advocate now contends KCL assumed its reporting duty as part of a completely separate contract or (in the alternative) as a gratuitous undertaking. (Doc. 17 at 3, 6.)

Youth Advocate points to a series of emails exchanged between Minette Bauer of Youth Advocate and Susan Treadwell of KCL. (See Doc. 24 ¶ 11.) According to Youth Advocate, these emails evidence a separate contract reached by the parties or show that KCL generated the disclosure information as a gratuitous business accommodation to Youth Advocate. (See Doc. 17.)

The court will briefly review the relevant portions of the email exchange. On June 20, 2003, Minette Bauer of Youth Advocate emailed Susan Treadwell of KCL to confirm that Youth Advocate had received the necessary documentation from KCL regarding the Plan, the ASO, and the Stop-Loss Policy and to advise Treadwell that the signed stop-loss insurance application had been faxed to her. (Doc. 1, Ex. A, at 3.) Approximately two hours later, Treadwell responded, in relevant part:

> Stop Loss Application – this is needed by the stop loss carrier. I still have not received the fax but will keep looking for it. . . . Stop Loss Disclosure Statement – this lists all of the claimants that could potentially hit the stop loss or have some ongoing conditions that need to be watched. Also it lists all of the employees that are on COBRA or disability. This is a standard document. I complete all the information and then you need to sign. This is similar to the document that you signed last year.

(<u>Id.</u>)  In the next email between Bauer and Treadwell, Bauer inquired on June 27, 2003, "And who fills out the stop loss contract- I assume the insurance company??" (<u>Id.</u> at 4.)  The final email included is from Treadwell to Bauer on an unspecified date stating: "Minnette [sic] - thank you for sending the signed stop loss application.  I forwarded it to the underwriter on Friday afternoon.  Now all I am waiting for is the disclosure statement.  Thanks again for all your help."  (<u>Id.</u> at 2.)  Youth Advocate contends that this exchange represents an independent agreement regarding the disclosure statement and related reports which bears no relation to the ASO or its arbitration provision.  It argues that the instant scenario is "no different than two parties entering into a written contract to paint a house, then subsequently entering into a second agreement to paint the roof."  (Doc. 17 at 6 n.4.)

      The court is unpersuaded by Youth Advocate's attempt to distance this litigation from its 2004 predecessor.  Indeed, the court finds that the claims advanced in the present complaint fall squarely within the scope of the ASO's broad arbitration provision.  The ASO itself contemplates that Youth Advocate may, from time to time, request the generation of certain documents and reports, as it specifically provides that, "[a]s the Administrative Services Provider, [KCL] agree[s] to . . . [p]rovide, subject to additional charges, other reports requested by [Youth Advocate] in writing."  (Doc. 14-3 at 2, 4, 28, 30, ASO § A, ¶ 12); <u>see</u> <u>McCarthy v. Azure</u>, 22 F.3d 351, 355 (1st Cir. 1994) ("[T]he final answer to [the question of arbitrability] is ordinarily a function of the parties' intent as expressed in the language of the contract documents.").  The email correspondence relied upon by

10

Youth Advocate constitutes a request from Youth Advocate for the generation of certain documents and reports by KCL.  That KCL would have such an obligation was anticipated by the parties when they entered into the ASO.  The parties agreed, as part of the ASO, that KCL would "[p]rovide . . . other reports requested by [Youth Advocate] in writing."  (Doc. 14-3 at 2, 4, 28, 30, ASO § A, ¶ 12.)

A consideration of the chronology of events in this litigation also lends support to the court's conclusion that this dispute "arises under" the ASO and is subject to its arbitration provision.  See American Financial Capital Corp. v. Princeton Elec. Prods., 1996 WL 131145, at * 8-9 (E.D. Pa. March 20, 1996) (discussing Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH, 585 F.2d 39 (3d Cir. 1978) and the importance of timing in determining whether a controversy "arises under" an arbitration agreement).  As one court has explained, generally

> controversies occurring after the date of the agreement either will have been engendered by the agreement governing the ongoing relationship between the parties, or will be addressable by reference to the terms of the agreement.  In the former case, the controversy is said to "arise under" the agreement because there is no context other than the preexisting contraction relationship in which the controversy between the parties could have arisen.

American Financial Capital Corp., 1996 WL 131145, at *8 (citing Becker, 585 F.3d at 47); see also Becker, 585 F.2d at 46 ("[T]he issues here presented 'arise out' of the 1974 Agreement in that they all arose in the course of and during the on-going relationship between [the parties], which relationship was created and governed by

the 1974 Agreement."). The entire relationship between Youth Advocate and KCL derives from the ASO. Absent this contractual relationship, KCL would have no motivation whatsoever – as part of the ASO, under a separate contract contemplated by the ASO, or simply as a client-driven business accommodation – to complete the disclosure statement, generate the related reports, and provide the same to Trustmark on Youth Advocate's behalf.

In light of these considerations, and given the presumption of arbitrability, the court concludes that the arrangement between KCL and Youth Advocate relating to the compilation and updating of the stop-loss disclosure information falls within the ambit of the arbitration provision of the ASO.

## IV. CONCLUSION

The court finds that the instant litigation is properly characterized as a "dispute, controversy or question arising under the terms of [the ASO]," and will refer it to arbitration consistent with the parties' agreement. Additionally, for the convenience of the parties and in the interest of judicial economy, the court will direct that these claims be consolidated with Youth Advocate's 2004 breach of contract claim, which is currently being arbitrated. An appropriate order follows.


S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:      May 30, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **YOUTH ADVOCATE PROGRAMS, INC.,** | : | Civil Action No. 1:06-CV-847 |
| Plaintiff | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| **KANSAS CITY LIFE INSURANCE COMPANY,** | : | |
| Defendant | : | |

## **ORDER**

AND NOW, this 30th day of May, 2007, upon consideration of defendant's renewed motion to compel arbitration and stay the instant proceedings (Doc. 27), and for the reasons set forth in the accompanying memorandum, it is HEREBY ORDERED that the motion is GRANTED as follows:

1. These proceedings are STAYED pending arbitration.

2. Plaintiff's claims shall be REFERRED to arbitration in accordance with the parties' Administrative Services Only agreement.

3. For the purposes of arbitration, the claims in this proceeding shall be CONSOLIDATED with the claim advanced by plaintiff against defendant in plaintiff's 2004 litigation.

Defendant's initial motion to stay proceedings and compel arbitration (Doc. 13) is DENIED as moot.

IT IS FURTHER ORDERED THAT the parties shall jointly file with the court a notice of the status of the arbitration proceedings within ninety (90) days of the date of this order.

                                                  S/ Christopher C. Conner
                                                  CHRISTOPHER C. CONNER
                                                  United States District Judge